UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-10-243 |
| | § | |
| MICHAEL BRINK, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court are Plaintiff's Rule 56 Motion for Partial Summary Judgment, (D.E. 20), and Plaintiff's Rule 56 Motion for Summary Judgment.  (D.E. 22, D.E. 23.)  For the reasons stated herein, the Government's Summary Judgment Motions are hereby GRANTED.

**I.      Jurisdiction**

The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1345 as this action is brought by the United States under the Clean Water Act, 33 U.S.C, § 1251 et seq.

**II.      Background**

**A.      Procedural Background**

This is a civil action brought by the United States to enforce the Clean Water Act.  In a Complaint filed in this Court on July 20, 2010, the Government alleges that Defendants Michael Brink and Dr. Steven Kalter, who own land at the confluence of La Para Creek and the Nueces River, constructed a dam a short distance from the Nueces River.  The Government alleges that, prior to constructing their dam, the Defendants were required to obtain a Section 404 permit from the U.S. Army Corps of Engineers pursuant to 33 U.S.C. §§ 1311(a), 1319, and 1344, and

that, because Defendants failed to obtain a permit, they are in violation of the Clean Water Act. (D.E. 1, D.E. 23.)

Defendants deny that La Para Creek constitutes "waters of the United States" subject to the Government's jurisdiction under the Act. (D.E. 19 at ¶ 6; D.E. 27 at 2.)  Defendants also deny that they "discharged" "pollutants" into "waters of the United States" for purposes of establishing liability under the Act.  (D.E. 27 at 2.) Finally, Defendants raise the affirmative defenses of waiver and estoppel and denial of equal protection. (D.E. 19 at 3-4).

The Government has moved for summary judgment on its Clean Water Act claim, (D.E. 23), and has also moved for partial summary judgment on the Defendants' affirmative defenses, (D.E. 20.)  Defendants have timely responded to both motions. (D.E. 27, D.E. 30.)

### B.      Facts Established On Summary Judgment

The summary judgment evidence establishes as follows:

#### 1.      The Waters

The Nueces River encompasses an area of approximately 17,000 square miles, and includes all or parts of Bee County, Live Oak County, Jim Wells County, Nueces County, San Patricio County, and several other counties in South Texas.  (D.E. 23, Ex. 3 (U.S. Geological Survey map); D.E. 23, Ex. 1 (map of Nueces River area).)  Lake Corpus Christi is a body of water impounded by dams constructed on the Nueces River.  (D.E. 23, Ex. 3 (U.S. Geological Survey)).  The Government's maps show that La Para originates north of the Nueces River and runs southwesterly into the Nueces River and Lake Corpus Christi. (D.E. 23, Ex. 3 (U.S. Geological Survey map); D.E. 23, Ex. 1 (map of Nueces River area).)[1]

---

[1] This court may take judicial notice of geographical locations and boundaries when the court has been furnished with official government maps.  See Government of Canal Zone v. Burjan, 596 F.2d 690, 694 (5th Cir. 1979) ("while there exists no comprehensive authoritative list of the types of sources 'whose accuracy cannot reasonably be questioned' and which, therefore, may be judicially noticed, 'official government maps have long been held

## 2.      Construction of the Dam and Initial Site Investigation

Defendants Michael ("Mike") Brink and Dr. Steven Kalter are neighbors who own land on either side of La Para Creek.  In May 2009, Mr. Brink met with Dr. Kalter and discussed erosion problems on their ranches as well as lack of water for stock animals, wildlife and marine life.  In order to confront these problems, the neighbors agreed to build an "erosion control system" on their adjoining properties, and to share the cost.  (D.E. 27, Ex. D (Letter dated July 5, 2009 from Mike Brink to Lloyd Mullins) at 1.)  The structure would be composed of concrete and, they believed, would serve to impound less than 94 acre-feet of water in the creek.

Around the same time, Mr. Brink contacted the Texas Commission on Environmental Quality ("TCEQ") and discussed his intentions to build the structure.  (Id. at 1.)   When Mr. Brink asked whether "any specific permit was necessary for the fill he was choosing to set below 94 feet" he was "instructed that no such permit was necessary if the impoundment was to hold less than 200 acre feet of water[.]"  (D.E. 27, Ex. G (Letter dated October 8, 2009, from Craig Sico to Desiree Edwards) at 2).[2]

Defendants did not consult the U.S. Army Corps of Engineers ("USACE") to inquire whether a federal permit might be required.  Mr. Brink attests that, at the time, he believed the individual he contacted at the TCEQ was the appropriate individual with whom to inquire. However, he subsequently learned that the individual was not a member of the TCEQ's water quality division; and that if he had reached an individual within the water quality division he

---

proper subjects of judicial notice.'" (quoting 29 Am.Jur.2d Evidence s 70) (citing 21 C. Wright and K. Graham, *Federal Practice and Procedure* s 5106 (1977)).

[2] The Texas Water Code ("TWC") provides that "[e]xcept as provided in Sections 11.142, 11.1421, and 11.1422 of this code, no person may appropriate any state water or begin construction of any work designed for the storage, taking, or diversion of water without first obtaining a permit from the commission to make the appropriation." TWC §11.121.  However, as discussed further below, the TWC creates an exemption to the permitting requirements for dams or reservoirs constructed on a person's own property with a storage of not more than 200 acre-feet.  See TWC §11.142(a); see also 30 TX ADC §297.21.

would have been advised that further permits were required, including a USACE Section 404 permit.  (D.E. 27, Ex. J (Letter dated October 30, 2009 from Mike Brink to David Weston) at 1.)

On June 6, 2009, Mr. Brink had workers start clearing brush and leveling the construction site on either side of La Para Creek.  (D.E. 27, Ex. D (Letter dated July 5, 2009 from Mike Brink to Lloyd Mullins) at 2.)  Construction began soon thereafter.  (Id.)

On June 22, 2009, the TCEQ Corpus Christi Region Office telephoned the South Texas Watermaster Program Office ("STWM") regarding a complaint from a Live Oak County resident that a "dam" was being constructed on La Para Creek.[3]  The USACE, as well as various local authorities, were subsequently informed of the issue as well. (D.E. 27, Ex. B (STWM Complaint/Inquiry Form, dated June 22, 2009) at 1.)

On June 24, 2009, a site investigation was conducted.  The investigation revealed that the structure under construction on La Para Creek was approximately thirty (30) feet wide, approximately two hundred (200) feet long, and approximately six (6) feet high.  (Id.) Mr. Brink, who arrived shortly thereafter, stated that he would be pouring concrete to complete the structure within the next few days.  (Id.)

At the June 24, 2009 site investigation, Mr. Brink was informed by Albert Garces, Watermaster Specialist with the TCEQ, that the structure might not meet the criteria to be exempt under the Texas Water Code ("TWC") and the Texas Administrative Code ("TAC"), which both generally provide that "a person" may, without obtaining a permit, construct for non-commercial purposes "on the person's own property a dam or reservoir with normal storage of

---

[3] Defendants object to the Plaintiff's use of the word "dam" to describe their structure, contending it is an "erosion control system," and not a dam.  (D.E. 27 at 2.)  However, a dam is simply a "barrier built across a watercourse for impounding water."  _Merriam-Webster Dictionary_ (2011).  Although the Court recognizes that there is a dispute as to how much water is impounded by the structure, the record shows it serves to impound _some amount_ of water in La Para Creek.  (D.E. 27, Ex. F at ¶ 4.)  Defendants' own attorney at the time referred to the structure as an "impoundment" and referred to the construction site as the "dam site."  (D.E. 27, Ex. G at 3.)  Defendants' engineer uses the term "erosion control _dam_ structure" to describe the structure.  (D.E. 27, Ex. K (Letter dated November 2, 2009 from Mike Brink to Albert Garces.) at 1)  Therefore, the Court uses the term "dam" herein.

not more than 200 acre-feet of water for domestic and livestock purposes." See TWC §11.142(a); 30 TX ADC §297.21.[4]

According to Defendants, however, "[n]o notice was given to the Defendants to holdup on pouring concrete." (D.E. 27 at 4.)  Therefore, on June 27, 2009, Mr. Brink had 210 yards of concrete delivered to the job site on La Para Creek.  Over the next few days, 15 crewman arrived to pour and finish the concrete. (D.E. 27, Ex. D (Letter dated July 5, 2009 from Mike Brink to Lloyd Mullins) at 2.) On June 30, 2009, the dam was completed.  (Id.)

### 3.    The Second Site Investigation and Actions by Agencies

On June 30, 2009, the same day the dam was completed, Lloyd Mullins, a Supervisor at the Corpus Christi Regulatory Field Office of the USACE, sent Mr. Brink a letter stating that the office had received notification of "possible unauthorized fill" on Brink's property.  The letter further stated:

> The U.S. Army Corps of Engineers regulates certain work in/or affecting waters of the United States under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.  Our preliminary investigation of the activity indicates it was conducted without the appropriate Department of the Army permit…You are requested to provide, in writing, information on this activity to assist us in our evaluation and in determining appropriate administrative or legal action…Be aware that the Corps of Engineers holds the property owner and all contractors responsible for unauthorized activities.

(D.E. 27, Ex. C (Letter dated June 30, 2009, from Lloys Mullins to Mike Brink) at 1).

On July 5, 2009, Mr. Brink responded to Mr. Mullins' letter, providing an account of the construction activities on La Para Creek and stating that he had contacted the TCEQ and had

---

[4] According to Mr. Brink, Mr. Garces told him that "he did not have any problems with what [Mr. Brink] was doing as there was no way the dam would hold anything close to 200 acre feet of water." (D.E. 27, Ex. G (Letter dated October 8, 2009, from Craig Sico to Desiree Edwards) at 3).  However, according the TCEQ's account, Mr. Garces expressed doubt about whether the dam on La Para Creek would qualify for the exemption because "the Codes specify that a dam or reservoir with normal storage of not more than 200 acre-feet of water for domestic and livestock purposes must be constructed on **one's own** property[,]" and this structure was located on two owners' property. (D.E. 27, Ex. H, Letter dated October 19, 2009, from David Weston to Mike Brink) at 1) (emphasis in original).  Mr. Garces emphasized to Mr. Brink that it was not known at the time whether the dam and reservoir qualified for the exemption. (Id. at 1-2.)

been advised that he did not need a permit.  (D.E. 27, Ex. D (Letter dated July 5, 2009 from Mike Brink to Lloyd Mullins) at 2.)

On July 7, 2009, the STWM conducted a second site investigation with both Mr. Brink and Dr. Kalter present, along with representatives of the Live Oak County Floodplain Administrator ("FPA"), the City of Corpus Christi, the Nueces River Authority, the General Land Office ("GLO"), and the USACE.  (D.E. 27, Ex. B (STWM Complaint/Inquiry Form, dated June 22, 2009) at 1.)

During the second site investigation, each of the authorities present gave the Defendants a preliminary assessment of their agency's position regarding the structure.

Mr. Garces of the TCEQ informed Brink and Kalter that if their dam and reservoir were found not to be in compliance with the TWC and the TAC, they would have to modify or remove the structure, or obtain a permit from the TCEQ through the permitting process.  (Id. at 2.)

Staff from the City of Corpus Christi indicated that they believed that the segment of La Para Creek where the dam had been constructed was within the City's flood easement, and that the landowners therefore might not have a right to place the dam within the City's easement. (Id.)

Staff from Live Oak County also indicated that the area might be within the designated floodplain of Live Oak County and that the FPA might require a permit. (Id.)

Mr. Bill O'Hara of the GLO indicated that, based on his preliminary assessment, the segment of La Para Creek on which Defendants had placed their dam was "non-navigable" and that the GLO would not pursue ownership of the bed and banks of this part of the creek at this time. (Id.)

Also at the second site investigation, representatives from the USACE Regulatory Field Office in Corpus Christi indicated that a permit might be required from the Corps for the "placement of fill or the construction of the dam on La Para Creek." (Id.)  According to Mr. Brink, a representative of the USACE named Desiree Edwards told him that "she did not know if a permit would be necessary, but if one was, she would assist [them] in obtaining an after the fact permit."  (D.E. 30, Brink Affidavit at 2.)

Thereafter, around August 26, 2009, the USACE requested comments from other relevant agencies regarding the "unauthorized placement of fill material" on La Para Creek.  The Corps stated that it had reviewed the project and determined a permit was required under Section 404 of the Clean Water Act, and that, based on the comments it received, the Corps might or might not require a permit.  (D.E. 27, Ex. F (Letter dated September 14, 2009, from Charles Maguire to Desiree Edwards) at 1.)

On September 14, 2009, the TCEQ sent a letter to Ms. Edwards at the USACE's Galveston District office responding to the Corps' request for comments.  (Id.)   The TCEQ stated that, although it had not yet conducted a full review of the unauthorized fill activity in La Para Creek the fill would "serve to impound La Para Creek, including areas within the normal pool elevation of Lake Corpus Christi," (id. at ¶4), and that "[t]he TCEQ does not recommend creating an impoundment within an existing impoundment such as Lake Corpus Christi."  (Id. at ¶2.)   The TCEQ advised that "[t]he applicant should consult with the TCEQ Water Rights Permitting and Availability Section…to determine if a water rights permit is required."  (Id. at ¶4.)  Mr. Brink and Mr. Kalter were also sent copies of the TCEQ's letter.  (Id.)

On October 8, 2009, Defendants' attorney at the time, Craig Sico, sent Ms. Edwards a letter stating that he had received the September 14, 2009 correspondence from the TCEQ and

was attempting to resolve the matter on behalf of his clients. The letter stated that, despite the inundation easement on the subject property granted to the Lower Nueces River Water Supply District, the landowners retained the right to impound water in the creek, and that neither the City of Corpus Christi nor any other local, state or federal entity possessed a real property interest in Brink's and Kalter's property that would interfere with their rights to impound reasonable amounts of water in the creek. (D.E. 27, Ex. G (Letter dated October 8, 2009, from Craig Sico to Desiree Edwards) at 1-2). Moreover, Mr. Sico stated, his client Mr. Brink had sought approval "from the appropriate district prior to commencement of the work." (Id. at 2.)

### 4. The Corps' Order to Remove the Dam

On October 19, 2009, Colonel David Weston at the USACE sent Mr. Brink another letter regarding the "unauthorized placement of fill material" in La Para Creek. The letter stated that La Para Creek had been identified as "waters of the United States" subject to the Corps' jurisdiction under Section 404 of the CWA. (D.E. 27, Ex. H (Letter dated October 19, 2009, from David Weston to Mike Brink) at 1.) The letter further stated that, based on Mr. Brink's response to the Corp' first request for information and an inspection of the site, the Corps had determined that the waters of La Para Creek were filled without a permit in violation of Section 404 of the CWA. (Id.)

Colonel Weston stated that, having solicited comments on this violation from state, federal and local agencies, as well as other departments within the USACE, the Corps had determined that Mr. Brink must take corrective measures, including removal of the structure "so that the creek is restored to pre-project elevations and conditions." (Id.) The letter gave Mr. Brink fifteen (15) days in which to comply. (Id.)

On October 26, 2009, Al Segovia, another representative of the TCEQ, wrote to Mr. Sico summarizing the various agencies' findings thus far and indicating that, as of this time, the TCEQ still had not been determined whether the Defendants' dam met the criteria for an exemption under the TWC and the TAC.  (D.E. 27, Ex. I (Letter dated October 26, 2009 from Al Segovia to Craig Sico) at 1-3.)  Defendants Mr. Brink and Dr. Kalter were also sent copies of Mr. Segovia's letter. (Id. at 3.)

On October 30, 2009, Mr. Brink responded to the October 19, 2009 letter from Colonel Weston at the USACE.  In the letter, Mr. Brink explained his initial confusion in contacting the wrong division within the TCEQ.  He conceded that, if he had contacted the correct division, he would have been told that a U.S. Department of the Army Corps of Engineers Section 404 permit was required to build the dam, but stated:

> the construction of this project without the necessary Department of the Army permit was not based on the disregard of the necessary permit authorization, but an oversight resulting from my unfamiliarity with the USACE regulatory program.

(D.E. 27, Ex. J (Letter dated October 30, 2009 from Mike Brink to David Weston) at 1.)

On November 2, 2009, Mike Brink wrote to Albert Garces of the TCEQ and attached the engineering report of civil-structural engineer Roger B. Thomas, concluding that the "erosion control dam structure" constructed on La Para Creek impounded a total volume of 92 acre-feet of water, well below the 200 acre-feet limit set by TWC § 11.142; that "[t]his concrete structure poses no risk of serious jeopardy to life, property, or important public resources; and that "[c]ursory review of aerial photographs, USGS maps and onsite visual inspection indicate that the wetlands area has increased from the unimproved state to its present condition, by at least twice the area."  (D.E. 27, Ex. K, (Attached Report of Roger B. Thomas) at 2.)

Mr. Brink also attached a letter from David Harris, co-chairman of Ducks Unlimited, stating his belief that the structure on La Para Creek was well built and would create permanent wetlands to support all kinds of wildlife in the area.  (D.E. 27, Ec. K, (Attached letter from David Harris).)  Also attached was a letter from Wildlife Biologist Donald J. Oliver stating his belief that the dam would benefit wildlife by creating "numerous permanent wetlands for this area" and that the dam would alleviate erosion and discharge of sediment into the Nueces River and Lake Corpus Christi. (D.E. 27, Ec. K, (Attached letter from Donald Oliver).)

On November 13, 2009, Tim Brown, a water attorney for the City of Corpus Christi, wrote a letter to Mr. Sico stating that the damn constructed within the City's inundation easement area interfered with the inundation of the property because it would prevent the inundation of slightly under 33.5 acres and reduce the capacity of the lake by approximately 487.9 acre feet of water.  Thus, the letter concluded, the dam was in violation of the City's easement and must be removed.  (D.E. 27, Ex. L (Letter dated November 13, 2009 from Timothy Brown to Craig Sico.))

On December 17, 2009, Mr. Brink wrote to Colonel Weston at the USACE providing an alternative to removal of the 51-foot section of concrete from the creek.[5]  Mr. Brink proposed placing a 12-inch pipe intended to divert the flow of La Para Creek around the unauthorized structure.  (D.E. 27, Ex. M (Letter dated January 5, 2010 from David Weston to Mike Brink.))

On January 5, 2010, Colonel Weston  replied to Mr. Brink's December 17, 2009 letter, stating that Mr. Brink's alternative proposal did not adequately comply with the USACE's order that the damn be removed as it would not restore the creek site to natural flow and conditions. (D.E. 27, Ex. M (Letter dated January 5, 2010 from David Weston to Mike Brink.))

---

[5] This letter has not been provided to the Court, but is discussed in Colonel Weston's January 5, 2010 reply, summarized below.

On July 7, 2010, Defendants applied to Like Oak County for a Development Permit, requesting that the structure at the mouth of La Para Creek be approved by the County. However, on August 17, 2010, David Nicholson from the Live Oak County Health Department denied the application as incomplete because the County had been advised that the USACE and the City of Corpus Christi required permits for the structure, and the application did not include evidence that the necessary permits had been obtained.  (D.E. 27, Ex. N (Letter dated August 17, 2010 from David Nicholson to Mike Brink) at 1.)

**III.    Discussion**

Based on the events described above, the Government now moves for summary judgment on its claim that the Defendants violated the Clean Water Act by failing to obtain a permit for their dam under Section 404 and that the Defendants' affirmative defenses of estoppel, waiver and equal protection fail as a matter of law. (D.E. 20, 22, 23.)  The Government seeks an order requiring Defendants to remove their dam and restore the area of La Para Creek to its pre-2009 condition.  (D.E. 23.)

**A.    Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>Judwin Props., Inc., v. U.S. Fire Ins. Co.</u>, 973 F.2d 432, 435 (5th Cir. 1992).

Pursuant to Fed. R. Civ. P. 56(c)(1), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." <u>Rivera v. Houston Indep. Sch. Dist.</u>, 349 F.3d 244, 246 (5th Cir. 2003); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case." <u>Rivera</u>, 349 F.3d at 247. The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." <u>Willis v. Roche Biomedical Labs., Inc.</u>, 61 F.3d 313, 315 (5th Cir. 1995); <u>see also</u> <u>Brown v. Houston</u>, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment"). Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party. <u>Rubinstein v. Adm'rs of the Tulane Educ. Fund</u>, 218 F.3d 392, 399 (5th Cir. 2000).

### B.      Analysis

The Clean Water Act ("CWA") is a pollution control statute that establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA provides, in relevant part, that it is illegal to discharge "pollutants," including "dredged or fill material," into the "waters of the United States" except in compliance with the permitting requirements of the statute.  33 U.S.C. § 1311.[6]  A person wishing to discharge "dredged or fill material" into "waters of the United States" must submit an application for a permit to be issued by the U.S. Army Corps of Engineers under the procedures outlined in Section 404 of the CWA.  See 33 U.S.C. § 1344; see also 33 C.F.R. § 323.1.[7]

Under § 1319(b) of the CWA, the Government is authorized to commence a civil action in federal district court for appropriate relief, including a permanent or temporary injunction, for any violation of the CWA's permitting requirements, including violations of § 1311 and § 1344. See 33 U.S.C. § 1319(b).

Defendants' contention that they commenced construction of their dam without the necessary Department of the Army permit due to "oversight resulting from … unfamiliarity with the USACE regulatory program," rather than knowing disregard of the necessary permit authorization, is not relevant in establishing their liability under the Act.  The regulatory provisions of the Clean Water Act are written without regard to intentionality and make the person responsible for discharge of any prohibited fill material strictly liable.   See U.S. v. Saint

---

[6] Section 1311(a) provides: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."  § 1311(a).
[7] This Court recently explained the procedures required for obtaining and issuing a permit under CWA Section 404. See Gouger v. U.S. Army Corps of Engineers, --- F.Supp.2d ----, 2011 WL 906654, *11 (S.D.Tex., March 15, 2011).

Bernard Parish, 589 F.Supp. 617, 617 (D.C. La., 1984) (citing United States v. Earth Sciences, Inc., 599 F.2d 368 (10th Cir.1979)).

To establish a violation of the CWA, "the United States need only show (a) that it has jurisdiction over the subject waters, (b) that the defendants discharged or placed fill in those waters, and (c) that the defendants did so without a permit from the Corps." U.S. v. Zanger, 767 F.Supp. 1030, 1033 (N.D. Cal. 1991). Therefore, in order to establish the Defendants' liability on summary judgment, the Court must resolve three issues: (1) whether the segment of La Para Creek on which Defendants placed their dam constitutes "waters of the United States"; (2) whether Defendants discharged "fill material" into "waters of the United States; and (3) whether Defendants have met their burden to establish any affirmative defenses to their unauthorized activities.

### 1.    Whether La Para Creek Is "Waters of the United States"

The Government contends that La Para Creek constitutes "waters of the United States" subject to the jurisdiction of the United States Army Corps of Engineers under the CWA. (D.E. 23 at 5.) Defendants object that La Para Creek is not a part of the "waters of the United States." (D.E. D.E. 27 at 2.)

The term "waters of the United States" establishes the "jurisdictional limits of the authority of the Corps of Engineers under the Clean Water Act." 33 C.F.R. § 328.1. The Federal Code of Regulations, 33 C.F.R. § 328.3(a), defines "waters of the United States" to include, among others, (i) traditional navigable waters, that is, "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," 33 C.F.R. § 328.3(a)(1), (ii) tributaries of covered waters, including traditional navigable waters, § 328.3(a)(5), and (iii) wetlands adjacent to covered waters,

including tributaries, § 328.3(a)(7).  See 33 C.F.R. § 328.3(a).[8]

In Rapanos v. United States, a plurality of the Supreme Court held that phrase "waters of the United States" includes only "relatively permanent, standing or continuously flowing bodies of water," such as streams, oceans, rivers, lakes, and other bodies of water forming geographical features.   547 U.S. 715, 731 (U.S. 2006).

Having reviewed the summary judgment evidence in light of these standards, the Court finds as a matter of law that the segment of La Para Creek on which Defendants built their dam constitutes "waters of the United States" under the CWA's definition.  It is relatively well established on summary judgment that La Para Creek does not fall within the statute's definition of traditional *navigable* waters, i.e., "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce."  See 33 C.F.R. § 328.3(a)(1).   At the second site investigation that took place on July 7, 2009, Bill O'Hara from the GLO determined that the segment of La Para Creek on which Defendants had placed their dam was

---

[8] 33 C.F.R. § 328.3(a) provides, in relevant part, that, "for the purpose of this regulation … [t]he term waters of the United States means:

> (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
> (2) All interstate waters including interstate wetlands;
> (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or (ii) from which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or (iii) which are used or could be used for industrial purpose by industries in interstate commerce;
> (4) All impoundments of waters otherwise defined as waters of the United States under the definition;
> (5) Tributaries of waters identified in paragraphs (a) (1) through (4) of this section;
> (6) The territorial seas;
> (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1) through (6) of this section.
> …

33 C.F.R. § 328.3(a).

"non-navigable."[9]   However, the Federal Code of Regulations, 33 C.F.R. § 328.3(a)(5), clarifies

that CWA jurisdiction extends to "tributaries" of navigable waters used in interstate or foreign

commerce.  § 328.3(a)(5).  A tributary is a "stream which contributes its flow to a larger stream

or other body of water."  Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526, 533 (9th

Cir.2001) (citing *Random House College Dictionary* 1402 (rev. ed.1980)).

     It is clear from the summary judgment evidence that La Para Creek is a "tributary" of the

Nueces River.  Defendants' own summary judgment evidence shows that water flows directly

from La Para Creek into the Nueces River.   (D.E. 27, Ex. H (Expert Report of Jeff D. Longino)

at 2, 6 (stating that the waters of La Para Creek flow into the Nueces River); D.E. 30, Ex. I

(Letter from Bill O'Hara) at 1 (stating that La Para Creek "empties into the Nueces River."))

The Nueces River encompasses an area of approximately 17,000 square miles, and includes all

or parts of Bee County, Live Oak County, Jim Wells County, Nueces County, San Patricio

County, and several other counties in South Texas.  (D.E. 23, Ex. 3 (U.S. Geological Survey);

D.E. 23, Ex. 1 (map of Nueces River area).)    Neither party disputes that the Nueces River

constitutes "waters of the United States" under the CWA.  See 33 C.F.R. § 328.3(a)(1).

     Defendants argue, however, that the Government has failed to demonstrate that La Para

Creek is a "relatively permanent waterway" under the Supreme Court's ruling in Rapanos.  In

Rapanos, a plurality of the Supreme Court confirmed that the term "navigable waters" includes

tributaries as well as wetlands "adjacent" to navigable waters.  Rapanos, 547 U.S. at 731; 33

C.F.R. § 328.3.   However, the Court went on to hold that, to constitute "waters of the United

States," a tributary or wetland must be a "relatively permanent, standing or continuously

---

[9] The TCEQ confirmed the GLO's finding in its October 26, 2009 letter to Mr. Sico, stating: "The GLO was contacted to determine whether the segment of La Para Creek, where the structure is located, is navigable or not.  It appears that the GLO has determined this segment of La Para Creek to be 'non-navigable.'"  (D.E. 27, Ex. I. Letter dated October 26, 2009 from Al Segovia to Craig Sico) at 2.)

flowing" body of water, such as those "found in 'streams,' 'oceans,' 'rivers,' 'lakes,' and

'bodies' of water 'forming geographical features.' All of these terms connote continuously

present, fixed bodies of water, as opposed to ordinarily dry channels through which water

occasionally or intermittently flows." See Rapanos v United States, 547 US 715, 731 (2006)

(plurality opinion). The Court further stated,:

> By describing "waters" as "relatively permanent," we do not necessarily exclude streams,
> rivers, or lakes that might dry up in extraordinary circumstances, such as drought. **We
> also do not necessarily exclude seasonal rivers, which contain continuous flow
> during some months of the year but no flow during dry months**… It suffices for
> present purposes that channels containing permanent flow are plainly within the
> definition, and that the dissent's "intermittent" and "ephemeral" streams — that is,
> streams whose flow is "[c]oming and going at intervals . . . [b]roken, fitful," or "existing
> only, or no longer than, a day; diurnal . . . short-lived" — are not.

Id. at 733, n. 5 (internal citations omitted) (emphasis added).

The plurality decision does not contain precise standards for distinguishing between

"intermittent" and "seasonal" waterways, stating "we have no occasion in this litigation to decide

exactly when the drying-up of a streambed is continuous and frequent enough to disqualify the

channel as a 'water of the United States.'" Id. But the decision suggests that "[c]ommon sense

and common usage distinguish between a wash and a seasonal river." Id.

Applying the Rapanos standard in light of common sense, it is clear that La Para Creek is

a "seasonal" creek over which the Corps has jurisdiction, and not simply an "intermittent" and

"ephemeral" waterway. A "creek," which is defined as "a natural stream of water normally

smaller than and often tributary to a river," see Merriam-Webster (2011), is clearly similar in

nature to other bodies of water forming geographical features, such as " 'streams,' 'oceans,'

'rivers,' [and] 'lakes[.]'" See Rapanos, 547 US at 731. The Government has attached

photographs by USACE representative Desiree Edwards showing La Para Creek with a water

level of approximately 93.7 feet above mean sea level. (D.E. 23, Ex. 4.) These photographs and

measurements were taken on October 5, 2010 — after construction of the dam.  (D.E. 23, Ex. 4.)
However, the Government has also attached a U.S. Geological Survey map.  "La Para" is shown
in the upper right hand corner of the map flowing southwesterly into the Nueces River.   (D.E.
23, Ex. 3.)[10]  In addition, the Government has submitted a photograph of the creek, containing
water, at the time Defendants commenced construction of the dam. (D.E. 31 at 4.)  The record
shows that the dam was constructed during the dry season.  (D.E. 27, Ex. J, Letter dated October
30, 2009 from Mike Brink to David Weston.)

The only contrary evidence is the Affidavit of Michael Brink himself stating that before
he built the dam "La Para Creek frequently held little or insubstantial amounts of water and was
seldom 'flowing.'"  (D.E. 30, Brink Affidavit at 1.)  However, Defendants submit no
photographs of the creek prior to construction of the dam to support this allegation.  In any case,
the Supreme Court's opinion in Rapanos does not require a showing that La Para Creek was
regularly "flowing."  Rather, the Court need find only that La Para was a "relatively permanent"
watercourse rather than "intermittent" and "ephemeral."  Rapanos, 547 US at 733, n. 5.  This
definition does not "exclude seasonal rivers, which contain continuous flow during some months
of the year but no flow during dry months…" Id.

Several decisions issued after Rapanos, interpreting the distinction between a "relatively
permanent" and an "intermittent," "ephemeral" stream, indicate that La Para Creek constitutes
"waters of the United States" under the Supreme Court's standard.  In United States v. Moses,
the Ninth Circuit addressed "whether a seasonally intermittent stream which ultimately empties
into a river that is a water of the United States can, itself, be a water of the United States."  496

---

[10] It is appropriate for the Court to consider such maps in determining the connection between water courses for
purposes of finding CWA jurisdiction.  See Environmental Protection Information Center v. Pacific Lumber Co.,
469 F.Supp.2d 803, 823 (N.D.Cal., 2007) (finding reliance on map sufficient to establish "some sort of a
hydrological connection" between waterways, even for "streams which are intermittent waterflows.")

F.3d 984, 989 (9th Cir.2007), cert. denied 554 U.S. 918, 128 S.Ct. 2963, 171 L.Ed.2d 886

(2008).  The court determined that an intermittent tributary, Teton Creek, was part of the waters

of the United States, even though the channel held water continuously for only two months out

of the year.  Id.; see also U.S. v. Vierstra, 2011 WL 1064526, *3 (D. Idaho March 18, 2011)

(finding on 12(b)(6) motion to dismiss that Low Line Canal would constitute a "relatively

permanent" non-navigable "tributary" if water flowed through it on a seasonal basis for six to

eight months of the year and the Canal had an ordinary high water mark and a defined bed and

bank); Gulf Restoration Network v. Hancock County Dev., LLC, 2011 U.S. Dist. LEXIS 17352,

* 19-20 (S.D. Miss. Feb. 22, 2011) (finding that Bayou Maron is a "relatively permanent,

standing or flowing bod[y] of water" given that: "[t]he dictionary defines 'bayou' as… a creek,

secondary watercourse, or minor river that is a tributary to another body of water";  the county

had built a bridge over the bayou; and it was a permanent flowing tributary of a larger bayou,

which in turn was a tributary of the Jourdan River, which empties into the Bay of St. Louis,

which empties into the Gulf of Mexico.) (citing Merriam-Webster's definition of "bayou");

Zanger, 767 F.Supp. at 1033 (decided prior to Rapanos) (finding that "Pacheco Creek" is a

"tributary of other 'waters of the United States' because Pacheco Creek is a tributary of the

Pajaro River, and both the creek and the river are tributary to Monterey Bay and the Pacific

Ocean.")

  Based on these standards and the statute's plain meaning, the Court finds on summary

judgment that  La Para Creek is a "tributary" subject to the Corps' jurisdiction.  See §

328.3(a)(5).[11]

---

[11] La Para Creek also constitutes a non-navigable wetland that is directly "adjacent" to navigable waters under 33 C.F.R. § 328.3(a)(7) because it is a wetland that is "bordering, contiguous, or neighboring" the navigable Nueces River. § 328.3(a)(7)  "Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.1(c).  Because the Creek is

### 2.   Whether Defendants "Discharged Fill Material" into "Waters of the United States"

The Government alleges that, in building their dam, Defendants have deposited "fill material" into La Para Creek in violation of the CWA, 33 U.S.C. § 1311, which provides that it is illegal to discharge "pollutants," including "dredged or fill material," into the "waters of the United States" except in compliance with the permitting requirements of the statute.  33 U.S.C. § 1311.   Defendants respond that they have not discharged "pollutants" into La Para Creek and that, in any case, their activities are exempt under the provisions of 33 U.S.C. §1344(f)(1)-(2).

### a.   "Discharge Fill Material"

The CWA prohibits the discharge of "pollutants," including "dredged soil ... rock, sand [and] cellar dirt," and other "fill material," into waters of the United States without obtaining a Section 404 permit. 33 U.S.C. § 1362(6); § 1344.   "[T]he term fill material means material placed in waters of the United States where the material has the effect of: (i) replacing any portion of a water of the United States with dry land; or (ii) changing the bottom elevation of any portion of a water of the United States."  33 C.F.R. §323.2(e)(1).  "Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and **materials used to create any**

---

"adjacent" to Nueces River, any further showing of a "significant nexus" between the Creek and Nueces River — the standard advocated by Justice Kennedy in Rapanos and recognized by the Fifth Circuit in U.S. v. Lucas, 516 F.3d 316, 327 (5th Cir. 2008) — is not required.  See U.S. v. Bailey, 516 F.Supp.2d 998, 1006, n. 5 (D.Minn., 2007) ("A careful reading of Justice Kennedy's opinion [in Rapanos] leaves no doubt that he distinguishes between wetlands adjacent to navigable-in-fact waters (in which case adjacency alone is sufficient to establish jurisdiction) and wetlands adjacent to nonnavigable *tributaries* of navigable-in-fact waters (in which case the Corps must introduce evidence establishing a significant nexus).") (emphasis in original) (citing Rapanos, 126 S.Ct. at 2236 (wherein Justice Kennedy addresses "whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain and *are not adjacent to waters that are navigable in fact*") (emphasis added); United States v. Fabian, 522 F.Supp.2d 1078, 1091, 2007 WL 1035078, at *13 (N.D.Ind.2007) (noting the Ninth Circuit's erroneous reading of Rapanos)); see also U.S. v. Robison, 505 F.3d 1208, 1223, n. 18 (11th Cir. 2007) ("Because Avondale Creek is not adjacent to the [navigable] Black Warrior River, but separated by Village Creek, Bayview Lake, and Locust Fork, there is no claim in this case that the 'significant nexus' test could be met by the adjacency of Avondale Creek and the Black Warrior River.")

**structure or infrastructure in the waters of the United States**."   §323.2(e)(2) (emphasis added).

"The term discharge of fill material means the addition of fill material into waters of the United States.   The term generally includes, without limitation…[p]lacement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction[,]" as well as the building of "**dams** and dikes[.]"   See §323.2(f) (emphasis added).

As noted above, Defendants object to the Government's use of the word "dam" to describe the structure they built in La Para Creek for "erosion control" purposes.   However, it is undisputed that Defendants have filled La Para with approximately 210 yards of concrete for the purpose of creating a "structure, infrastructure, or impoundment[.]"   See id. (D.E. 27, Ex. D (Letter dated July 5, 2009 from Mike Brink to Lloyd Mullins) at 2.)   The Government has submitted photographs of the concrete sides of the structure protruding from the water of the creek.  (D.E. 23, Ex. 4 (Photographs taken by USACE employees Desiree Edwards and John Wong on October 5, 2010.)   Defendants' activities constitute a "discharge of fill material" into the creek. See §323.2(f).

**b.       The § 1344(f)(1) Exemption**

Defendants argue their activity falls under the exemption from the permitting requirements codified in §1344(f)(1).   (D.E. 30 at 5.) See 33 U.S.C. § 1344(f)(1);33 C.F.R. 323.4(1)(i).[12]   The CWA creates an exemption for "[n]ormal farming, silviculture and ranching

---

[12] The Government objects that Defendants failed to plead the §1344 (f) exemption in their answer.  (D.E. 31 at 6.) "[C]ourts have consistently held that statutory exemptions, particularly from remedial statutes, must be pled as affirmative defenses."  Spann ex rel. Hopkins v. Word of Faith Christian , 589 F.Supp.2d 759, 763 (S.D.Miss., 2008 ) (citing cases).  "However, a defendant's 'failure to plead an affirmative defense will not always result in waiver,

activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the

production of food, fiber, and forest products, or upland soil and water conservation practices, as

defined in paragraph (a)(1)(iii) of this section." § 1344(f)(1)(A); 33 C.F.R. 323.4(1)(i).  To fall

under this exemption, the activities "must be part of an established (i.e., on-going) farming,

silviculture, or ranching operation and must be in accordance with definitions in §

323.4(a)(1)(iii) [which defines "cultivating," "harvesting," "minor drainage," "plowing" and

"seeding," though not "upland soil and water conservation practices."][13]   Activities on areas

---

particularly where the responding party has an opportunity to respond to the affirmative defense and no prejudice results.'" Id. (quoting Passa v. City of Columbus, No. 2:03-CV-81, 2007 WL 3125130, 5 (S.D.Ohio Oct. 24, 2007)) (citing Rogers v. McDorman, 521 F.3d 381, 385-386 (5th Cir.2008)).  Here, Defendants raised this affirmative defense in their response to Plaintiff's motion for summary judgment.  (D.E. 30.)  The Government has had sufficient opportunity to reply and has replied.  (D.E. 31.)

[13] For purposes of the exemption, § 323.4(a)(1)(iii) defines the activities as follows:

(A) Cultivating means physical methods of soil treatment employed within established farming, ranching and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality or yield.

(B) Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(C)(1) Minor Drainage means:

(i) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. (Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a section 404 permit.);

(ii) The discharge of dredged or fill material for the purpose of installing ditching or other such water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(iii) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of CWA, and which are in established use for the production of rice, cranberries, or other wetland crop species. (The provisions of paragraphs (a)(1)(iii)(C)(1)(ii) and (iii) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.)

(iv) The discharges of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or

lying fallow as part of a conventional rotational cycle are part of an established operation. Activities which bring an area into farming, silviculture, or ranching use are not part of an established operation." §323.4(a)(1)(ii).

Defendants contend summary judgment is inappropriate because the §1344(f)(1) exemption may apply, and that it is the Government's burden to prove that the exemption does not apply.  (D.E. 30 at 5.)[14]  However, the burden is on *Defendants* to establish that their activities satisfy the requirements of the exemption.  See <u>Avoyelles Sportsmen's League, Inc. v.</u>

---

loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year of discovery of such blockages in order to be eligible for exemption.

(2) Minor drainage in waters of the U.S. is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adapted to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming). In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(D) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing and similar physical means utilized on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. The term does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dry land. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing as described above will never involve a discharge of dredged or fill material.

(E) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

§ 323.4(a)(1)(iii).
[14] Defendants state as follows: "The Clean Water Act by its own terms exempts from 'prohibition or regulation' by the USACOE…numerous activities, including the use of fill material for water conservation practices, construction of stock ponds, the construction of farm roads, etc…However, it is the government's burden to prove in this case that the Clean Water Act applies in spite of these exceptions, and no credible evidence has been offered on that issue by the government."  (D.E. 30 at 5.)

Marsh, 715 F.2d 897, 926 (5th Cir. 1983); see also U.S. v. Akers, 785 F.2d 814, 819 (9th Cir.1986); In re Carsten, 211 B.R. 719, 732 (Bkrtc. D.Mont. 1997).

Defendants have not met their burden on summary judgment to raise a genuine issue of material fact regarding whether the § 1344(f)(1) exemption applies to the structure they built on La Para Creek.  The record shows that Mr. Brink and Mr. Kalter decided to build the dam (or, as they call it, "low water crossing" or "erosion control system") in order to alleviate erosion problems on their ranches and provide water for stock animals, wildlife and marine life.  (D.E. 27, Ex. D (Letter dated July 5, 2009 from Mike Brink to Lloyd Mullins) at 1.)

As explained, the CWA creates an exemption for various farming related activities, including "upland soil and water conservation practices[.]"  § 1344(f)(1)(A); 33 C.F.R. 323.4(1)(i).  However, the Fifth Circuit has construed this exemption narrowly.  See Avoyelles, 715 F.2d at 925 n. 44 ("§ 404(f)(1) was designed to be a narrow exemption.") (upholding trial court's determination that removing vegetation from wetlands not part of "normal farming activities" for purposes of exemption); see also U.S. v. Brace, 41 F.3d 117, 127-128 (3d Cir. 1994) (finding farmer's spreading of dredged material in covered waters did not fall under the exemption for "normal farming activities" because it was not part of an "established farming operation" and did not fall under the definitions in § 323.4(a)(1)(iii)); U.S. v. Cumberland Farms of Connecticut, Inc., 647 F.Supp. 1166, 1175 (D.Mass. 1986) (holding that farming on freshwater wetland was not "established and continuing" for purposes of Section 1344(f) exemption where there was no persuasive evidence that any portion of the site was farmland prior to acquisition, draining, and grading by the farm operators); Leslie Salt Co. v. U.S., 820 F.Supp. 478, 481-482 (N.D.Cal., 1992) (construction of concrete bulkhead and a tide gate,

designed to control the flow of water through the culvert onto owner's property, not subject to the exemption for agricultural activities under Section 404(f)(1)(B)).

As explained, it is Defendants' burden to show they built the structure as part of an "established" "(i.e., on-going)" operation involving practices falling under the definitions in § 323.4(a)(1)(iii).   See § 1344(f)(1)(A); 33 C.F.R. 323.4(1)(i); Avoyelles, 715 F.2d at 926. Defendants have presented no evidence in this regard.[15]   The Court therefore finds on summary judgment that Defendants have discharged "fill material" into La Para Creek and that Defendants have failed to raise a genuine issue of material fact as to whether their activities are exempt.  See § 1344(f)(1); Akers, 785 F.2d at 819 ("To be exempt from the permit requirements, one must demonstrate that proposed activities both satisfy the requirements of § (f)(1) and avoid the exception to the exemptions (referred to as the 'recapture' provision) of § (f)(2).")

### 3.   Affirmative Defenses of Waiver and Estoppel

Defendants raise the affirmative defenses of waiver and estoppel, arguing that the Government's conduct in failing to inform Defendants that a permit was required before they built their dam, or in leading them to believe none was required, mandates estopping the Government from enforcing the permit provisions of the CWA. (D.E. 19, D.E. 27.)

Estoppel generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit.  Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 515-16 (Tex. 1998).  "[T]he doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive,

---

[15] Moreover, the exemption in § 1344(f)(1) contains a "recapture provision," which states that the exemption does not apply to "[a]ny discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced[.]" 33 U.S.C. § 1344(f)(2); see also 33 C.F.R. §323.4(a)(2).  "Where the proposed discharge will result in significant discernible alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration."  33 C.F.R. § 323.4(c).  "Reviewing courts have broadly construed the recapture provisions of § 1344(f)(2)."  In re Carsten, 211 B.R. 719, 732 (Bkrtc. D.Mont. 1997) (citing cases).

of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." Johnson & Higgins, 962 S.W..2d at 515-16.[16]

Here, the Corps never made any representations to Mr. Brink that a permit was not required to build his dam.  When Mr. Brink contacted the TCEQ and discussed his intentions to build the dam, he was allegedly instructed that "no permit was necessary if the impoundment was to hold less than 200 acre feet of water[,]" as this would qualify the dam for an exemption under the TWC and the TAC. (D.E. 27, Ex. D (Letter dated July 5, 2009 from Mike Brink to Lloyd Mullins) at 1; D.E. 27, Ex. G (Letter dated October 8, 2009, from Craig Sico to Desiree Edwards) at 2).   The TCEQ representative apparently made no mention of the requirement of obtaining a Section 404 permit under the federal Clean Water Act.   Mr. Brink has himself conceded that, had he contacted the correct division of the TCEQ prior to starting construction, he would have been advised that further permits were required, including a Section 404 permit from the USACE.  (D.E. 27, Ex. J (Letter dated October 30, 2009 from Mike Brink to David Weston) at 1.)   Thus, Defendants fail to make out the primary element of a *prima facie* case for estoppel: a false representation or concealment of material facts. Johnson & Higgins., 962 S.W.2d at 515-16.[17]

Even if Defendants had established a *prima facie* case for estoppel, "[i]n order to establish estoppel against the government, a party must establish affirmative government

---

[16] Waiver is a similar defense in practice, but has distinct elements.  "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right."  Ulico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 778 (Tex. 2008).  "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right."  Id.

[17] To the extent Defendants argue that the approval of a local or state agency would have precluded the Corps from enforcing the CWA, this claim is also without merit.  Under the Supremacy Clause, state and local authorities cannot block the enforcement of federal environmental laws. U.S. Const. Art. VI, cl. 2; see also Bailey, 516 F.Supp.2d at 1014 (County's approval of the plat for a wetlands area did not preclude Corps of Engineers from enforcing the CWA).

misconduct in addition to the four traditional elements of estoppel." Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d 592, 607 (5th Cir. 2007) (quoting Taylor v. United States Treasury Dep't, IRS, 127 F.3d 470, 474 (5th Cir. 1997)).   Defendants have made no showing of affirmative misconduct by the Corps in enforcing the CWA.   At best, the record shows that the Corps was dilatory in informing Defendants that a permit was required.   The record shows that around August 26, 2009, after conducting the July 7, 2009 site investigation, the USACE solicited comments from other federal, state and local agencies in order to determine whether to mandate a permit for the dam.   (D.E. 27, Ex. F (Letter dated September 14, 2009, from Charles Maguire to Desiree Edwards) at 1.)   On October 19, 2009, the USACE informed Mr. Brink that a permit for the dam was indeed required and that, as Defendants had failed to seek such a permit, the dam must be removed.   (D.E. 27, Ex. H (Letter dated October 19, 2009, from David Weston to Mike Brink) at 1.)

Even if the Court found the Government should have proceeded more quickly in informing Mr. Brink that a permit or removal was required, untimely action does not, on its own, amount to affirmative misconduct sufficient to estop the Corps from enforcing the CWA.   See U.S. v. Boccanfuso, 882 F.2d 666, 671 (2d Cir. 1989) (holding that Corps' failure to timely process a property owner's application for a permit to build a wall did not amount to affirmative misconduct by the Corps for purposes of estoppel, stating "[we reject] the district court's determination that the Corps' failure timely to process [defendant's permit] application amounted to affirmative misconduct…Federal agencies do not lose jurisdiction by their failure to comply with statutory time limits unless the statute demonstrates congressional intent that this result occur…") (citing Brock v. Pierce County, 476 U.S. 253, 266, 106 S.Ct. 1834, 1842, 90 L.Ed.2d 248 (1986)).

In sum, the Court finds on summary judgment that Defendants' evidence fails to support a *prima facie* case for waiver and estoppel against the Government, let alone the additional element of affirmative misconduct.

### 4.    Equal Protection

Defendants lastly argue that the Corps violated the Equal Protection Clause of the United States Constitution by administering its regulations in a disparate manner.  Defendants point out that other "erosion control systems" and dams have been built on the Nueces River and other rivers in Texas without complaint by the Corps of Engineers.  In fact, they state, there is another similar structure on La Para Creek itself.  (D.E. 19 at 3-4.)  Defendants also complain that they were told by Corps representatives that an "after the fact" permit would be allowed, but that when they applied for said after the fact permit for their dam, the Corp "refused to even consider it."  (Id.)  These actions, Defendants claim, were "in bad faith and in derogation of Defendants' right to Equal Protection."  (Id.)

This affirmative defense also fails.  To make out a violation of the Equal Protection Clause, Defendants would have to show that they were similarly situated to other individuals who were allegedly treated more favorably, and that the Corps's disparate treatment of the two lacked a rational basis.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Unruh v. Moore, 326 Fed.Appx. 770, 771-72 (5th Cir.2009); Whiting v. Univ. of Southern Miss., 451 F.3d 339, 348 (5th Cir.2006).  "[A] court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." McDonald v. Village of Winnetka, 371 F.3d 992, 1002 (7th Cir.2004); see also Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir.2001) (same).

Even if Defendants had met the heavy burden to show that others who built dams on La Para Creek were "similarly situated," they have not met their burden to demonstrate that the Corps lacked any rational basis for imposing the permit requirement on Defendants.  See Lindquist v. City of Pasadena, 525 F.3d 383, 387 (5th Cir.2008) (a party alleging violation of equal protection "must carry the heavy burden of 'negativing any reasonably conceivable state of facts that could provide a rational basis' for their differential treatment.")  The Government contends the dam may have an adverse impact on the aquatic habitat and the general ecosystems of the Nueces River and downstream bays and estuaries.  (D.E. 23 at 5.)  Ms. Edwards from the Corps of Engineers Corpus Christi Regulatory Field Office states that fresh water and nutrients in La Para Creek cannot flow into the Nueces River or Lake Corpus Christi "when the elevation of the impounded water is below the elevation of the spillway in the middle of the Brink-Kalter Dam." (D.E. 23, Ex. 4.)[18]

Defendants have submitted contrary evidence, in the form of expert reports and letters from other interested parties, indicating that Mr. Brink's dam impounds only a small amount of water and that the impoundment is beneficial to both the area of La Para Creek and the down-stream ecology of the Nueces River.[19]  However, "an equal protection violation does not arise if

---

[18] The Court notes Defendants' objections to the admissibility of Ms. Edwards' testimony, such as lack of personal knowledge.  (D.E. 30 at 3-4.)  However, Ms. Edwards, a Corps representative who personally inspected the dam, has sufficient personal knowledge to make her statements regarding the dam admissible summary judgment evidence.  See Fed. R. Civ. P. 56(c)(4).  Defendants' objections to Ms. Edward's statement go to the weight to be given to her opinions by the fact-finder, not their admissibility.  See Schneider v. OG & C Corp., 684 F.Supp. 1269, 1271 n. 6 (S.D.N.Y.1988); Copiers Typewriters Calculators, Inc. v. Toshiba Corp., 576 F.Supp. 312, 315-316 (D.Md.1983).

[19] The Court has fully reviewed this evidence, which consists of the following experts reports and letters from other interested parties:

　　　First, Defendants submit an expert report from Roger B. Thomas, P.E., concluding that the dam impounds only a total volume of 92 acre-feet of water, well below the 200 acre-foot limit set by TWC § 11.142; that "[t]his concrete structure poses no risk of serious jeopardy to life, property, or important public resources; and that as a result of the dam's presence, the wetlands area has increased by two fold.  (D.E. 27, Ex. K, (Attached Report of Roger B. Thomas) at 2).

there is any basis for a classification or official action that bears a debatably rational relationship to a conceivably legitimate governmental end." <u>Reid v. Rolling Fork Public Utility Dist.</u>, 854 F.2d 751, 754 (5th Cir.1988) (citing <u>Shelton v. City of Coll. Station</u>, 780 F.2d 475, 482 (5th Cir.1986); <u>Stern v. Tarrant County Hosp. Dist.</u>, 778 F.2d 1052, 1056 (5th Cir.1985)).   In fact, "[a]s long as there is a conceivable rational basis for the official action, it is immaterial that it was not *the* or a primary factor in reaching a decision or that it was not *actually* relied upon by the decisionmakers or that some other nonsuspect irrational factors may have been considered." <u>Id</u>. (citations removed) (emphasis in original); <u>see</u> <u>also</u> <u>Stern</u>, 778 F.2d at 1056.

Given that that Government conceivably had a rational basis for requiring a permit from Defendants for their dam, the Defendants have not met their burden to make out an equal protection violation.   <u>See</u> <u>Bailey</u>, 516 F.Supp.2d at 1014 (rejecting similar claim that Corps violated Equal Protection by denying defendants an after the fact permit while granting one to the County) (citing <u>Geach v. Chertoff</u>, 444 F.3d 940, 945 (8th Cir.2006)); <u>see</u> <u>also</u> <u>Norton Const.</u> <u>Co. v. U.S. Army Corps of Engineers</u>, 280 Fed.Appx. 490, 495 (6th Cir.  2008) ("The district

---

Second, Defendants submit a letter from David Harris, co-chairman of Ducks Unlimited, stating his belief that the dam on La Para Creek will create permanent wetlands to support all kind of wildlife in the area.  (D.E. 27, Ec. K, (Attached letter from David Harris).)

Third, Defendants submit a letter from Wildlife Biologist Donald J. Oliver stating his belief that the dam will benefit wildlife by creating "numerous permanent wetlands for this area" and that the dam will alleviate erosion and discharge of sediment into the Nueces River and Lake Corpus Christi. (D.E. 27, Ec. K, (Attached letter from Donald Oliver).)

Fourth, Defendants submit a letter from Wildlife Biologist Macy Ledbetter, stating the dam has positively impacted wildlife and wildlife habitat, that the structure impounds only a small area of water, and that the dam will cause no "negative effects to structures or human life upstream"  (D.E. 30, Ex. F (Letter from Macy Ledbetter) at 1.)

Fifth, Defendants submit a letter from Charles A. DeYoung, Ph.D, stating that the "erosion control structure" constructed by Mr. Brink creates valuable wetland habitat, will likely reduce erosion on the banks of La Para Creek and Nueces River, and that it is beneficial to the ecology of both La Para Creek and the down stream ecology of the Nueces River. (D.E. 30, Ex. G (Letter from Chares A. De Young at 1.)

Finally, Defendants submit the survey of civil and structural engineer Jeff D. Longino, concluding that "[b]ecause the structure does not significantly impact the normal natural velocities of the existing creek, nor does it significantly impact the normal river inundation into the creek, it is not a threat to public health, safety and welfare nor does it increase flood levels." (D.E. 30, Ex. H (Expert report of Jeff D. Longino) at 5.)

court had no difficulty finding a rational relationship between limiting the construction of new landfills and preserving the integrity of the water supply, describing such a relationship as "self-evident." We agree. Because the statute bears a rational relationship to a legitimate state interest, Norton's equal protection argument must fail.")

## IV.   Conclusion

For the reasons stated above, Plaintiff's Rule 56 Motion for Partial Summary Judgment, (D.E. 20), and Plaintiff's Rule 56 Motion for Summary Judgment, (D.E. 22, D.E. 23), are hereby GRANTED.  By discharging "fill material" into La Para Creek without obtaining a Section 404 permit, Defendants violated the Clean Water Act.  33 U.S.C. § 1344.  Pursuant to 33 U.S.C. §§ 1311, 1344, and 1319(b), Defendants are hereby ORDERED to remove the structure on La Para Creek and restore the area to its pre-2009 condition in accordance with the orders of the U.S. Army Corps of Engineers.

SIGNED and ORDERED this 6th day of June, 2011.

_Janis Graham Jack_
Janis Graham Jack
United States District Judge